PAY LESS DRUG STORES, Plaintiff,

v.

JEWEL COMPANIES, INC., Defendant.

No. C–80 3227 AJZ.

United States District Court,
N.D. California.

Feb. 1, 1984.

Geoffrey M. Kalmus, Kramer, Levin, Nessen, Kamin & Frankel, New York City, Richard W. Canady, Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, Cal., for plaintiff.

Stephen V. Bomse, Daniel E. Titelbaum, Heller, Ehrman, White & McAuliffe, San Francisco, Cal., for defendant.

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

ZIRPOLI, District Judge.

Defendant Jewel Companies, Inc. moves for summary judgment on each of plaintiff's claims brought under § 16(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(b), for recovery of "short swing" profits allegedly realized by Jewel. Plaintiff has filed a cross-motion for summary judgment on its first and second claims and contends that questions of fact exist with respect to its third and fourth claims. Defendant's motion for summary judgment as to all claims is granted and plaintiff's cross-motion is denied.

## I.  Factual Background

This dispute arose out of a merger battle between defendant Jewel Companies, Inc. (Jewel) and Pay Less Drug Stores Northwest, Inc. (Northwest), which now owns, but was at the time unrelated to, the plaintiff in this suit, Pay Less Drug Stores (Pay Less).  Both Jewel and Northwest sought to merge with Pay Less.  Jewel was Pay Less' first suitor.  On November 9, 1979, Jewel and Pay Less entered into a merger agreement under which Jewel would acquire Pay Less by issuing .652 shares of Jewel stock for each Pay Less share.  Also on November 9, Pay Less' then largest shareholder, Mrs. Mary C. Skaggs, as well as The L.J. and Mary C. Skaggs Foundation (the second largest shareholder and controlled by Mrs. Skaggs), entered into agreements with Jewel.  Under the Skaggs Foundation agreement, Jewel was required to purchase the Pay Less shares owned by the Foundation for $15 cash on November 26, 1979.  These shares amounted to 13.2 percent of Pay Less' outstanding stock.  Under the agreement with Mrs. Skaggs, Jewel received an option to acquire Mrs. Skaggs' shares (amounting to 19.2 percent of Pay Less) for .652 shares of Jewel in the event that the merger agreement between Jewel and Pay Less "terminated, expired, or was cancelled."

Jewel purchased the Pay Less shares from the Foundation on November 26, 1979, as required by the Foundation agreement, and Jewel and Pay Less were proceeding toward completion of their merger. Then, on December 31, 1979, Northwest announced that it intended to make a cash tender offer for all of the Pay Less shares. The announcement stated that the price and time of exchange had not yet been determined.  On January 17, 1980, Northwest formally commenced a tender offer for all of the Pay Less shares at a price of $22.50 per share.  Towards the end of January representatives of Northwest met with Pay Less management to discuss a merger.  Pay Less was also in contact with representatives of Jewel to determine whether Jewel was willing to increase the value of its offer under the previous merg-

er agreement. Jewel was apparently unwilling to increase the price offered, so on February 1, 1980, Pay Less signed a merger agreement with Northwest under which Northwest increased its tender offer price to $24 per share. The merger agreement with Northwest also provided that all remaining Pay Less shareholders after the expiration of the tender offer would be "frozen out" of Pay Less through a merger with a wholly-owned subsidiary of Northwest which would pay $24 cash for each untendered Pay Less share. Pay Less' Board of Directors sent a letter to each shareholder in which the Board endorsed Northwest's revised tender offer and the freeze-out merger.

By February 17, 1980, Northwest had acquired more than half of Pay Less' outstanding shares. The tender offer was extended into March. On March 7, Jewel, faced with the defeat of its attempted merger, tendered the 13.2 percent block of Pay Less shares that it had acquired from the Skaggs foundation. Subsequently, on March 18, Jewel gave notice to Mrs. Skaggs that it intended to exercise, on March 29, its option to acquire her Pay Less shares.[1] Mrs. Skaggs refused to honor the option at that time, stating that its exercise was "premature."[2]

On May 19, 1980, Jewel again gave notice that it would exercise its option to purchase Mrs. Skaggs' shares. The exchange date was to be June 9. Mrs. Skaggs again refused Jewel's attempt to exercise, this time contending that the option was unenforceable. On July 18, Northwest completed the merger with Pay Less under which all Pay Less shareholders were cashed out at $24 per share. Jewel sued Mrs. Skaggs for breach of contract on July 23, 1980, based on her refusal to permit the exercise of the option. Pay Less, now a wholly-owned subsidiary of Northwest, brought this suit on August 4 to recover under § 16(b) of the Securities

Exchange Act the profits allegedly realized by Jewel under the Skaggs option.

This court ordered that the present suit be stayed until the resolution of the contract action between Jewel and Mrs. Skaggs. On January 4, 1983, this court having previously granted partial summary judgment in favor of Jewel's contract claim, the suit between Jewel and Mrs. Skaggs was settled. Under the settlement Mrs. Skaggs paid $3,150,000 in cash to Jewel. Pay Less now seeks to recover all or a portion of the amount received by Jewel on the theory that it is a short-swing "profit" realized from a "purchase" of Pay Less stock by Jewel.

## II. The Claims

Pay Less has asserted several alternative claims in which it seeks to match different "sales" and "purchase" dates which it contends should trigger § 16(b) liability in this case. The first claim seeks to match Jewel's March 7, 1980 sale of the 13.2 percent block to Northwest under the tender offer with the corresponding "purchase" being Jewel's first attempt to exercise the Skaggs option (March 29, 1980). The amount of profit alleged to be recoverable is determined by reference to the amount paid to Jewel in settlement of its contract claim against Mrs. Skaggs. The second claim is identical to the first, except that the purchase date alleged is June 9, 1980, when Jewel made its second attempt to exercise the option.

▮ The third claim alleges that Jewel "purchased" Mrs. Skaggs' shares sometime prior to March 7, 1980 (before it had even attempted to exercise the option), when Jewel "determined" that it would exercise the option. The corresponding sale which is alleged to trigger § 16(b) liability is the July 18, 1980 involuntary sale of Pay Less stock in the "cashout" merger with North-

---

1. The option required the giving of at least 10 days' notice and also provided that it could be exercised only within the period of 30 to 60 days after the "termination, expiration or cancellation" of the merger agreement between Jewel and Pay Less.

2. At this time Mrs. Skaggs would have received, under the option, Jewel stock worth substantially less than the $24 cash that was being offered pursuant to the Northwest tender offer.

west. The fourth claim also seeks to match this involuntary sale with either the March 29 or the June 9 attempted exercise of the Skaggs option. Under the fourth claim Jewel is alleged to be a "beneficial owner" subject to § 16(b) at the time of the attempted purchases because it is alleged to have possessed a "presently exercisable" option even before it attempted to exercise it. (Jewel was not a "beneficial owner" by virtue of actual ownership of stock for purposes of this purchase-sale sequence because it had sold the 13.2 percent block prior to its first attempt to exercise the option. *See Foremost-McKesson, Inc. v. Provident Securities Co.,* 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1976).)

## III. Discussion

■ All of plaintiff's claims, except the third, depend upon a finding that Jewel's attempted exercise of the option, in conjunction with the amount received by it in settlement of the contract action, constituted a "purchase" which triggers § 16(b) liability.[3] The court finds that while Jewel's attempts to exercise the option are sufficient to come within the broad scope of the term "purchase" as it has been interpreted for purposes of § 16(b), summary judgment in favor of defendant is appropriate because the facts of this case involve an "unothodox transaction" which presented no danger of speculative abuse of inside information. *See Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973).

### A. Jewel's Attempted Exercise of the Option was a "Purchase" of Pay Less stock

■ The first issue to be determined in deciding whether liability exists on the facts of this case is whether Jewel's at-

tempted exercise of the Skaggs option can even be considered a "purchase." Jewel argues that since no transfer of shares occurred, and since Jewel did not assume any market risk, or obtain any of the benefits of stock ownership (such as voting rights), no "purchase" can be said to have occurred. While this argument is not wholly unpersuasive, the court concludes that the liberal definition of "purchase" that has been given to § 16(b) in order to effect its broad remedial purpose warrants a finding that the attempted exercise of the option and the subsequent favorable settlement of the contract action do constitute a "purchase." Other courts have held that a "purchase" for purposes of § 16(b) can occur even though no stock changed hands. In *Matas v. Siess,* 467 F.Supp. 217 (S.D.N.Y.1979), the defendants had exercised stock appreciation rights for cash. The fact that no stock changed hands, and that only a single transaction was involved, rather than a separate "purchase" and "sale," did not prevent the court from holding the defendants liable under § 16(b) where it found that "the possibility of speculative abuse" existed. *Id.* at 223–24. *See also Morales v. Gould Investors Trust,* 445 F.Supp. 1144, 1148–51 (S.D.N.Y.1977) (unenforceable contract held to be a "sale"); *Volk v. Zlotoff,* 285 F.Supp. 650, 657 (S.D.N.Y.1968) (rescinded exercise of stock option is a "purchase"). *Matas* has twice been cited with approval by the Ninth Circuit. *See Portnoy v. Memorex Corp.,* 667 F.2d 1281, 1286 n. 1 (1982) (Reinhardt, J., concurring), and *Whittaker v. Whittaker Corp.,* 639 F.2d 516, 522 (1981).

Jewel cites *Memorex* in support of its contention that § 16(b) liability is precluded where there was no actual transfer of stock. That case is distinguishable, how-

---

**3.** The court finds that plaintiff's third claim is disposed of by *Reliance Electric Co. v. Emerson Electric Co.,* 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972). In that case the Court stated that "a 'plan' to sell that is conceived within six months of purchase clearly would not fall within § 16(b) if the sale were made after the six months had expired...." *Id.* at 423, 92 S.Ct. at 599. The holding of that case makes it clear that a party can escape § 16(b) liability by delib-

erately structuring its actions so as to keep them outside of the literal terms of the statute. Thus the fact that Jewel may have "determined" to exercise the option while it was still a "beneficial owner" subject to § 16(b) (by virtue of its ownership of the 13.2% block of stock purchased from the Skaggs Foundation) does not mean that a "purchase" within the meaning of § 16(b) had taken place at that time.

ever, because it involved the sale of an option before it was exerised, whereas in the present case Jewel attempted to exercise its option, thus creating for itself and Mrs. Skaggs enforceable contract rights and obligations concerning the transfer of the stock. In *Memorex* the Ninth Circuit refused to recast the sale of an option and its subsequent exercise by the purchaser into the hypothetical transaction (suggested by the plaintiff in that case) in which the seller of the option exercised it and then sold the hypothetically-purchased shares. In the present case, unlike *Memorex,* Jewel did not sell its option (indeed it was not transferable), but rather, it exercised it, thus giving it a contractual right and obligation to buy the shares. Therefore, the court concludes that the contractual rights acquired by Jewel when it gave notice to Mrs. Skaggs that it was exercising the option are sufficient to constitute a "purchase" on the date that the transfer would have taken place if Mrs. Skaggs had not breached the contract.

■ The finding that a "purchase" took place, however, does not mean that liability under § 16(b) exists on the facts of this case. The Supreme Court held in *Kern County Land Co. v. Occidental Petroleum Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1973), that in cases involving "unorthodox" types of transactions (those which do not fall clearly within the purview of § 16(b)) the courts should look to the purpose that Congress intended to be served when it enacted § 16(b) as an aid in interpreting the statute. That purpose is to protect "the public 'by preventing [corporate insiders] from speculating in the stock on the basis of information not available to others.'" *Kern,* 411 U.S. at 592, 93 S.Ct. at 1743 (quoting from Senate Report No. 792, 73d Cong., 2d Sess., 9). When considering whether § 16(b) liability should be imposed in these "borderline" transactions, therefore, the court must "inquire whether the transaction may serve as a vehicle for ... the realization of short-swing profits based upon access to inside information...." *Kern,* 411 U.S. at 594, 93 S.Ct. at 1744.

### B. The Facts of this Case Involve an "Unorthodox" Transaction

■ Pay Less argues that this case does not involve any "unorthodox" transaction which would warrant the further inquiry, under the Kern analysis, as to whether there was a potential for speculative abuse of inside information by Jewel. It relies primarily upon a recent Fifth Circuit case, *Texas International Airlines v. National Airlines, Inc.,* 714 F.2d 533 (1983), in support of its argument that the "narrow exception" created by the *Kern* line of cases is not applicable to the present case. The court holds otherwise.

This case hardly presents the "orthodox" purchase-sale type of transaction that was involved in *Texas International.* In that case, the defendant had purchased shares on the open market pursuant to a tender offer, and later sold those shares to its opponent in a control battle after it became apparent that the contest had been lost. Actual shares changed hands. Simple purchases and sales were involved. In the present case, on the other hand, no shares changed hands when Jewel sought to exercise its option. Furthermore, the present case involved an option which was acquired by Jewel before it became an insider. The option fixed the exercise price, and also narrowly confined the time within which the option could be exercised. No option was involved in *Texas International.* The Supreme Court in *Kern* listed "dealings in options" among those types of transactions which might be found "unorthodox." 411 U.S. at 593 n. 24, 93 S.Ct. at 1743 n. 24. Thus, this case is distinguishable from *Texas International.*

While the majority opinion in *Texas International* stressed the fact that the defendant in that case had engaged in voluntary trades, in contrast with the involuntary conversion of shares that had occurred in *Kern,* this court believes that *Kern* should not be read to make the volitional character of the transaction the sole inquiry in deciding whether a transaction is "unorthodox." The Supreme Court's opinion in *Kern* indicated that an analysis of the potential for speculative abuse should

be made in cases involving "unorthodox" transactions. It did not limit the definition of unorthodox transactions to cases involving involuntary exchanges. Thus, this court concludes that the facts of the present case, despite the volitional nature of Jewel's attempted exercise of the option, present a sufficiently unorthodox transaction to warrant the application of the *Kern* analysis.

### C. No Danger of Speculative Abuse of Inside Information Was Presented on the Facts of This Case

The facts of this case present no possibility of the speculative abuse "based upon access to inside information" that § 16(b) was intended to guard against. *Kern,* 411 U.S. at 594, 93 S.Ct. at 1744. Although Jewel's decision to exercise its option was a voluntary one, it was not a decision "based upon" inside information about Pay Less which Jewel could utilize to gain unfair advantage over other shareholders. The decision was based upon the difference in price between Northwest's *public* tender offer (which Jewel had no prior knowledge of) and the value of Jewel stock that would have to be paid to Mrs. Skaggs upon exercise of the option. The rate of exchange of Pay Less for Jewel shares was fixed by the option before Jewel became a statutory insider by virtue of its purchase of the 13.2 percent block from the Skaggs foundation. These facts permitted Jewel to engage in what can best be described as an arbitrage transaction, not one in which it was able to take advantage of inside information about Pay Less at the public's expense.

Pay Less argues that it is possible that Jewel's access to inside information about Pay Less (in the course of the merger negotiations in late 1979) could have influenced Jewel's decision not to fight Northwest's attempt to acquire Pay Less. Even if such were the case, it would not present a danger of speculative abuse of inside information, at the expense of the public, which § 16(b) is designed to deter. If Jewel's access to information about Pay Less

led it to conclude that Northwest was offering too much for Pay Less and that it would be economically unsound for Jewel to increase its own offer to top or match Northwest's, it can hardly be said that this permitted Jewel to *speculate* in Pay Less stock. Although Pay Less shareholders might have benefitted if Jewel had increased its offer for control of Pay Less, the decision not to do so merely prevented the public shareholders from receiving a higher offer from Jewel. Thus, Jewel's access to inside information, at most, *prevented* it from trading with the public. The failure to increase its offer for Pay Less shares thus does not mean that Jewel had speculated on the basis of information not available to the public.

Jewel's possible use of inside information in no way could have increased the amount of profit that Jewel would realize under the option. That amount had become fixed by the difference between the price which Jewel had to pay for Pay Less shares under the option and the price at which those shares could be sold to Northwest under the tender offer (or would be converted under the freeze-out merger). Nor did Jewel avoid a loss based upon an expected decline in the price of Pay Less stock which Jewel's access to inside information gave it reason to anticipate. Thus, the public's lack of access to information available to Jewel in no way could have permitted Jewel to engage in the kind of speculative abuse that would warrant the imposition of § 16(b) liability. The court therefore concludes that neither of Jewel's attempts to exercise the Skaggs option constituted a purchase which, when paired with a sale occurring within a six-month period, will trigger liability under § 16(b).

Since all of plaintiff's claims (except the Third, which has been previously disposed of, *see supra* note 3) depend upon a finding that one of the attempts to exercise the option is a "purchase" *within the meaning of § 16(b),* summary judgment in favor of defendant is granted as to all claims.[4]

SO ORDERED.

---

4. Since the case may be disposed of on the basis of the *Kern* analysis, the court finds it unneces-

sary to discuss the issues of (1) whether Jewel

was a "beneficial owner" subject to § 16(b) be-
cause it possessed a "presently exercisable" op-
tion (See Rule 16a–2(b), 17 C.F.R. § 240.16a–
2(b); *Colan v. Monumental Corp.,* 713 F.2d 330 (7th Cir.1983)), and (2) whether the principal of
*Steinberg v. Sharpe,* 95 F.Supp. 32, 33–34 (S.D.N.
Y.1950), *aff'd without opin.,* 190 F.2d 82 (2d
Cir.1951), is applicable to this case.