Frank D. SEINFELD, Plaintiff,

v.

HOSPITAL CORPORATION OF AMERICA, et al., Defendants.

No. 85 C 6651.

United States District Court,
N.D. Illinois, E.D.

May 2, 1988.

Lowell E. Sachnoff, Brian D. Roche, Mark A. Kaprelian, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for plaintiff.

Barry S. Alberts, W. Donald McSweeney, William A. Montgomery, Aaron J. Kramer, Schiff, Hardin & Waite, Chicago, Ill., Michael A. Weinberg, Charles L. Glick, Christina M. Tchen, Skadden, Arps, Slate,

Meagher & Flom, Chicago, Ill., for defendants.

## MEMORANDUM OPINION

BRIAN BARNETT DUFF, District Judge.

This case arises under § 16(b) of the Securities Exchange Act of 1934 ("§ 16(b)"), 15 U.S.C. § 78p(b). Defendant Hospital Corporation of America ("HCA") and nominal defendant American Hospital Supply Corporation ("American") have each moved to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the reasons set forth below, the motions are granted.

### FACTS[1]

In late 1984, the chief executives of HCA, an operator of medical facilities, and American, a manufacturer and distributor of health care products, began discussing the possibility of a merger in response to adverse business conditions in their related industries. On March 30, 1985, the companies executed an Agreement and Plan of Reorganization (the "Merger Agreement") in contemplation of a merger.

Under the Merger Agreement, the merger would involve an exchange of stock whereby the shareholders of each company would receive stock in a third, newly-created company. During the period prior to either the effectuation of the merger ("Merger Date") or other termination of the Merger Agreement ("Termination Date"), both parties were to have a number of special rights against and obligations to the other, including the right of access to confidential financial information and the obligation to keep their businesses intact and to report any material changes therein.

The Merger Agreement also included a provision to defend against a third party interfering in the consolidation and merger.

This provision—the so-called "lock-up" option[2]—gave both companies the option to effect an exchange of 39 million newly issued American shares, representing 35% of that company's stock, for 29.5 million shares of HCA stock, a 25% stake, should a third party make a public competing offer for American common stock. The option also provided that, in the event of its exercise, both companies would vote the shares acquired under it (the "option shares") in favor of the Merger Agreement and against any competing offerors.

On June 20, 1985, nearly three months after the Merger Agreement was executed, Baxter Travenol Laboratories, Inc. ("Baxter"), a manufacturer of a diverse line of medical care products, announced a proposal to acquire American at a price 45% higher than the effective price offered by HCA. The American Board rejected the offer.

On June 24, HCA informed American that the Baxter offer activated the lock-up option, and on July 2, upon expiration of the applicable statutory waiting period, the option became exercisable by either American or HCA.

On July 12, HCA filed a Form 3 with the Securities and Exchange Commission ("SEC") in which it reported that on July 2, by virtue of the lock-up option, it had become the "beneficial owner" of 39 million shares of American common stock for the purposes of § 16(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78p(a).

Baxter subsequently sweetened its offer for American, and on July 15, 1985, these two companies announced the completion of a merger agreement between them. On that same date, Baxter, American, and HCA entered into an agreement (the "Settlement Agreement") in which HCA agreed to the termination of the Merger Agreement and the relinquishment of the "lock-up" option in return for the payment of

---

1. For the purposes of this motion to dismiss, "the complaint is construed in the light most favorable to plaintiff and its allegations are taken as true." 5 Wright & Miller, Federal Practice & Procedure: Civil § 1357 at 594.

2. "A lock-up is an arrangement or transaction by which the target corporation in a contested takeover gives one proposed acquirer a competitive advantage over other bidders or prospective bidders. Usually, a lock-up involves granting the favored suitor (the "white knight") an option to buy shares or assets of the target." Note, "Lock-up options: Toward a State Law Standard," 96 *Harv.L.R.* 1068 (1983).

cash by American. HCA was to receive $10 million if the Baxter–American merger was not consummated by April 1, 1986, $150 million if it was so consummated, and an additional $50 million if, following consummation but prior to January 15, 1991, HCA and its customers had purchased a specified amount of Baxter products. On July 19, 1985, HCA reported to the SEC that it was no longer a "beneficial owner" of American.

Plaintiff did not make a demand on American to file suit against HCA. Instead, believing that such a demand would be futile, he filed this action alleging that HCA's relinquishment of its rights under the lock-up option in exchange for $200 million constituted insider trading under § 16(b) and that, accordingly, HCA must disgorge all sums received pursuant to the Settlement Agreement. Plaintiff also named American as a nominal defendant in the action.

HCA and American filed separate motions to dismiss under Fed.R.Civ.P.Rule 12(b)(6). HCA claims that plaintiff failed to state a claim under § 16(b) for two reasons: (1) HCA was never a beneficial owner for the purposes of § 16(b); (2) even if HCA did become a beneficial owner when the lock-up option became exercisable, it did not thereafter effectuate a "purchase and sale" of American equity securities as required for liability to arise under § 16(b).

American adopts HCA's grounds for moving to dismiss. It also moves to dismiss on the grounds that plaintiff lacks standing because he failed to first demand that American bring this action, and cannot establish that such a demand would have been futile.

## DISCUSSION

### Standing

■ Section 16(b) provides that the owner of shares of a corporation may bring a § 16(b) suit on behalf of the corporation, provided that he first makes a demand of the corporation to institute the suit and the corporation fails to do so.[3] Section 16(b), Securities Exchange Act of 1934, 15 U.S.C. § 78p(b). Courts, however, have analogized this provision to Federal Rule of Civil Procedure Rule 23.1, *see Colan v. Monumental Corp.*, 524 F.Supp. 1023, 1028 (N.D.Ill.1981); *Abbe v. Goss*, 411 F.Supp. 923 (S.D.N.Y.1975), and have therefore excused plaintiffs for failing to make such a demand "where the complaint recites circumstances which would make the demand futile or useless." *Jannes v. Microwave Communications, Inc.*, 57 F.R.D. 18, 21 (N.D.Ill.1972). "[T]he determination of whether a demand is necessary or whether an excuse is sufficient is within the sound discretion of the [district] court." *Id. See also Nussbacher v. Continental Illinois National Bank & Trust*, 518 F.2d 873, 877 (7th Cir.1975), *cert. denied*, 424 U.S. 928, 96 S.Ct. 1142, 47 L.Ed.2d 338 (1976); *Prager v. Sylvestri*, 449 F.Supp. 425 (S.D.N.Y. 1978).

■ Plaintiff acknowledges that he never made a demand upon American to bring an action against HCA, but claims that his complaint sets forth facts indicating that such a demand would have been futile. This court agrees. Unlike most § 16(b) actions, in which the group of alleged insiders is composed of a small number of the corporation's officers and directors, in this case each and every American board member took part in the deal with HCA. Further, the board entered into the Baxter merger and the option cash-out after extended negotiations among all parties and, one can reasonably infer, with the "good-faith" belief that the deal represented a mutually beneficial, and lawful, arrangement. That it would turn around a short time later and sue HCA for entering into the deal strains credulity. Accordingly, plaintiff has standing to bring this action.

**3.** Securities Exchange Act of 1934, § 16(b), 15 U.S.C. § 78p(b) states, in pertinent part, that "[s]uit to recover [insider] profits may be instituted at law or in equity in any court of competent jurisdiction by the issuer, or by the owner of any security of the issuer in the name and in behalf of the issuer if the issuer shall fail or refuse to bring such suit within sixty days of request or shall fail diligently to prosecute the same thereafter."

*Merits*

Congress enacted § 16(b) in 1934 as part of an effort to curb what it perceived as "the widespread use of confidential information by corporate insiders to gain an unfair advantage in trading their corporate securities." *Kern County Land Corp. v. Occidental Corp.*, 411 U.S. 582, 608, 93 S.Ct. 1736, 1751, 36 L.Ed.2d 503 (1972). In order to achieve its goals, Congress chose a "relatively arbitrary rule capable of an easy administration." *Bershad v. McDonough*, 428 F.2d 693, 696 (7th Cir.1970), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed. 2d 440 (1971). The "flat rule" of § 16(b) imposes strict liability on corporate insiders who purchase and sell, or sell and purchase, equity securities within a period of less than six months irrespective of their intent to use, or actual use of, confidential information. *Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 422, 92 S.Ct. 596, 599, 30 L.Ed.2d 575 (1972); *Oliff v. Exchange International Corp.*, 669 F.2d 1162, 1165 (7th Cir.1980).

Although in many cases the "flat rule" of § 16(b) does provide for "easy administration," the complexities of modern corporate arrangements and securities transactions have produced cases for which easy administration is not possible. Frequently, as in this case, the problems are definitional. Who is a "corporate insider?" What is a "purchase and sale?" When does the six-month period begin and end? These are questions which a simple reading of the statute cannot answer.

This case raises two distinct but, as shall be seen, interwoven problems of § 16(b) law. First, does ownership of a lock-up option to purchase more than 10% of the shares of a corporation confer insider status on the option holder? Second, does the relinquishment of that lock-up option in consideration of a cash payment constitute a "simultaneous purchase and sale" of the underlying security for the purposes of this statute?

*Beneficial Ownership*

The language of § 16(b) makes clear that it applies only to a small class of persons. Officers, directors and "beneficial owners of more than 10 per centum of any class of any equity security" of the corporation are "corporate insiders" for the purposes of this law. Everyone else falls outside the statute's proscriptions. *Foremost–McKesson v. Provident Securities*, 423 U.S. 232, 243–44, 96 S.Ct. 508, 515–16, 46 L.Ed.2d 464 (1975). Since HCA was not an officer or director of American, the first question this court must resolve is whether HCA became a beneficial owner of ten percent of American securities when it acquired the lock-up option.

The Seventh Circuit has held that "[o]wnership of an unexercised option will confer beneficial ownership only when the option carries with it rights of ownership." *Colan v. Monumental Corp.*, 713 F.2d 330, 335 (7th Cir.1983). The court explained:

> Section 16(b) proscribes short-term trades by one owning more than ten percent of a class of equity securities on the not unreasonable assumption that one owning that large a percentage of a company will have access to inside information and would, like any other insider, give in to the temptation to abuse that knowledge to make a profit. Those courts that have considered whether ownership of an option to buy stock presents this potential for abuse agree that an option to buy, *without more*, does not provide access to inside information and therefore does not present the potential for speculative abuse that stock ownership does. (Emphasis added).

*Id.* at 334–35 (Citations omitted). However, where the option holder acquires access to inside information and influence generally available only to corporate insiders, he may well become a beneficial owner of the underlying stock. *Id.* at 335; *Newmark v. RKO General, Inc.*, 425 F.2d 348 (2d Cir.1970), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970), *cited with approval, Colan v. Monumental Corp.*, 713 F.2d at 334 (noting that in *Newmark* "option holder who was assured that company would be managed in his interests was [a] beneficial owner"). *See also Whittaker v. Whittaker Corp.*, 639 F.2d 516,

525–26 (9th Cir.), *cert. denied*, 454 U.S. 1031, 102 S.Ct. 566, 70 L.Ed.2d 473 (1981); *Whiting v. Dow Chemical Corp.*, 523 F.2d 680, 687–88 (2d Cir.1975).

■ In this case, HCA argues that, notwithstanding its Form 3 report of July 2, 1985, in which it stated that it became beneficial owner of 39 million shares of American common stock under § 16*(a)*, it should not be deemed a beneficial owner of such stock for the purposes of this § 16*(b)* action. This court disagrees. Although the acquisition of a lock-up option and the filing of a Form 3 report, do not, by themselves, render a person a beneficial owner under § 16(b), *see Colan v. Monumental Corp.*, 713 F.2d at 332–33,[4] the additional rights of ownership conferred upon HCA by the Merger Agreement did serve to make HCA a beneficial owner of the underlying shares on the date the lock-up option became exercisable.

Under the Merger Agreement, HCA had the right to inspect the books of American, the right to oversee its business, and the right to require American to continue to conduct its business in accordance with its past business practices. Further, once Baxter made its public offer for American and the lock-up option became exercisable, HCA had the ability to ensure that the option shares would be voted in favor of the American–HCA merger. Such additional rights of ownership gave HCA the sort of access to inside information and influence generally available only to corporate insiders, and thus rendered HCA a beneficial owner of the stock underlying the lock-up option. Because such stock represented far more than ten percent of American stock outstanding at the time, HCA became, as of July 2, 1985, a ten percent beneficial owner of American for the purposes of § 16(b).

*Purchase and Sale*

■ The fact that HCA became a beneficial owner of more than ten percent of American stock on July 2 does not, of course, end the analysis. Section 16(b) does not proscribe all transactions by corporate insiders; it prohibits their "purchase and sale, or sale and purchase, within six months of equity securities of the corporation." Further, where the defendant is a "corporate insider" only because he is a ten percent beneficial owner—i.e., he is not an officer or director—he will be liable for a "purchase-sale sequence ... only if he was a [ten percent] beneficial owner before the purchase." *Foremost–McKesson v. Provident Securities*, 423 U.S. 232, 250, 96 S.Ct. 508, 519, 46 L.Ed.2d 464 (1975). *See also Allis–Chalmers Manufacturing Company v. Gulf & Western Industries, Inc.*, 527 F.2d 335 (7th Cir.1975) (to be charged with a § 16(b) violation, defendant must have been an insider prior to the initial purchase or sale), *cert. denied*, 423 U.S. 1078, 96 S.Ct. 865, 47 L.Ed.2d 89 (1976).

Determining whether a purchase and a sale occurred, and whether, if they did, the defendant was a corporate insider before the purchase is not as easy as it sounds. Complicated corporate transactions and trading in modern securities instruments can involve shifts of stock ownership rights in ways that differ, to varying degrees,

---

**4.** Section 16(a) of the Securities Exchange Act of 1934 states:

> Every person who is directly or indirectly the beneficial owner of more than 10 per centum of any class of an equity security ... shall file, at the time of registration of such security on a national securities exchange or by the effective date of a registration statement ... *or within ten days after he becomes such beneficial owner ...* a statement indicating his ownership at the close of the calendar month and such changes in his ownership as have occurred during such calendar month. (Emphasis added).

In *Colan v. Monumental Corp., supra*, the court noted that SEC Rule 16a–2b, 17 C.F.R. § 240.16a–2b (1982), expressly requires the inclusion of the underlying stock of "presently exercisable options" within the calculation of ten percent beneficial ownership for § 16(a) reporting requirements. However, it held that this rule was not determinative of ten percent beneficial ownership status for the purposes of § 16(b) because of the differences in purposes of the two subsections. *Id.* at 334 ("That the [defendants] were obligated to report their dealings in Monumental stock under § 16(a), then, does not answer our inquiry. Rather, we must determine whether they were beneficial owners for purposes of § 16(b).").

from traditional cash-for-stock transactions; and even traditional cash-for-stock transactions may involve contracts which leave unclear the precise moment the purchase occurred for the purpose of § 16(b).

To deal with these problems, the courts have developed two analytical frameworks for § 16(b) cases. Where the transaction involves a traditional cash-for-stock exchange, the "objective" or "orthodox" approach is used. *See Kern County Land Corp. v. Occidental Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1972). Under this approach, a purchase occurs at the moment the purchaser becomes irrevocably entitled to obtain an equity security for a given price, and a sale occurs at the moment the seller becomes irrevocably entitled to receive consideration for it.[5] *See Portnoy v. Revlon*, 650 F.2d 895, 900–02 (7th Cir.1981). If a corporate insider engages in a purchase and sale within six months, and if he was an insider prior to the time he made the initial purchase, he must disgorge his profits irrespective of his intent to use inside information, and irrespective even of his access to inside information at the time of the transactions. *Ol-*

*iff v. Exchange International Corp.*, 669 F.2d 1162, 1165–66 (7th Cir.1980).

On the other hand, where the case involves an unorthodox or borderline transaction—i.e., "stock conversions, exchanges pursuant to mergers and other corporate reorganizations, stock reclassifications, and dealings in options, rights and warrants," *Kern County Land Corp. v. Occidental Corp.*, 411 U.S. at 593 n. 24, 93 S.Ct. at 1744 n. 24—the "subjective" or "pragmatic" approach may come into play. Under this approach a transaction "will not be deemed a 'purchase' or 'sale' if the particular situation could not have given rise to an abuse of insider information." *Oliff v. Exchange International Corp.*, 669 F.2d at 1166. Although liability remains "strict"—the insider's intent to use, and actual use of, inside information in making his investment decisions remains irrelevant—it is so only where a court determines that there exists, at least, the *possibility* "for the evil which Congress sought to prevent—the realization of short-swing profits based upon access to inside information." *Kern County Land Corp. v. Occidental Corp.*, 411 U.S. at 594, 93 S.Ct. at 1744.

---

**5.** Courts occasionally confuse the concepts of "purchase" and "sale" for the purpose of determining whether a person is a "ten percent beneficial owner" with the definitions of those terms for the purposes of determining whether there has been a liability-producing short-swing "purchase and sale." *See, e.g., Colan v. Cutler-Hammer, Inc.*, 812 F.2d 357, 367 (7th Cir.1987); *see also Newmark v. RKO General, Inc.*, 425 F.2d 348, 356 n. 8 (2d Cir.1970) (properly distinguishing between two concepts), *cert. denied*, 400 U.S. 854, 91 S.Ct. 64, 27 L.Ed.2d 91 (1970).

Although a "purchase" for the purpose of determining beneficial ownership does not arise until a person becomes irrevocably committed to pay for stock, since this is the time when the "incidents of ownership"—i.e., access to inside information—are likely to pass, *see Colan v. Monumental Corp.*, 713 F.2d at 333–34, a "purchase" for the purpose of determining liability occurs at the moment when the insider becomes irrevocably *entitled* to receive stock at a given price. *See Portnoy v. Revlon*, 650 F.2d at 901; *Lewis v. Realty Equity Securities Corp.*, 396 F.Supp. 1026, 1029 (S.D.N.Y.1975). For it is at this precise moment that the insider acquires "the ability to profit from the stock." Tomlinson, "Section 16(b): A Single Analysis of Purchases and Sales—Merging the Objective and Pragmatic Analyses," 1981 *Duke L.J.* 941, 953

(1981); *see Stella v. Graham Paige Motors Corp.*, 232 F.2d 299 (2d Cir.) (no purchase occurred upon execution of purchase agreement because the purchase remained contingent until actual closing), *cert. denied*, 352 U.S. 831, 77 S.Ct. 46, 1 L.Ed.2d 52 (1956); *Champion Home Builders v. Jeffress*, 490 F.2d 611, 617 (6th Cir.) (no purchase occurred where seller retained ability to cancel deal prior to closing), *cert. denied*, 416 U.S. 986, 94 S.Ct. 2390, 40 L.Ed.2d 763 (1974).

Similarly, whereas beneficial ownership ends when a person actually transfers ownership of the stock and thereby (supposedly) relinquishes his access to inside information, *see Reliance Electric Co. v. Emerson Electric Co.*, 404 U.S. 418, 92 S.Ct. 596, 30 L.Ed.2d 575 (1972), a "sale" for the purpose of determining liability occurs when an insider becomes irrevocably *entitled* to receive a sum certain for his security. For it is then that his profit on a "purchase-sale" sequence is ensured. *See Abrams v. Occidental Petroleum Corporation*, 450 F.2d 157, 165 (2d Cir.1971) (Friendly, J.), *aff'd sub nom, Kern County Land Corp. v. Occidental Petroleum*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1972); *see also Bershad v. McDonough*, 428 F.2d 693 (7th Cir.1970) (sale occurred upon grant of call option where the nature of the option virtually ensured that it would be exercised), *cert. denied*, 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1971).

One unfortunate consequence of the development of the pragmatic approach has been a tendency on the part of most courts to apply it too often. Since virtually any transaction can be described in a way that makes it appear more complicated than a traditional cash-for-stock exchange, courts invariably turn to the "pragmatic approach" to decide whether liability should attach. Yet over-reliance on this approach creates a number of serious problems.

First, it unnecessarily complicates section 16(b) analysis. Transactions which clearly fall within the proscriptions of the statute become susceptible, through artful lawyering and judicial confusion, to findings that they lacked the requisite potential for speculative abuse. Similarly, transactions which the statute does not proscribe become the subject of litigation by parties who believe, not always erroneously, that they can portray the case as involving the potential for such abuse. *See* Note, "Mismatching Convertible Debentures and Common Stock Under Section 16(b)," 1985 *Duke L.J.* 1057 (1985).

Second, it sends confused signals to insiders as to what they may and may not do under § 16(b). As a result, some trades that come within § 16(b)'s proscriptions are undertaken out of the mistaken belief that they are permissible; others are avoided despite the fact that they are not within the class of transactions § 16(b) prohibits. *See* Comments, "Short–Swing Profits in Failed Takeover Bids—The Role of Section 16(b)," 59 *Wash.L.R.* 895, 904–05 (1984).

Finally, and perhaps most importantly, the judicial reliance on the pragmatic approach's fact-specific analysis flies in the face of Congress' clear intent in enacting § 16(b). Whatever the balance which the courts might deem appropriate between a "flat rule" and a careful inquiry into the actual potential for insider abuse in each case, Congress did not leave this choice to the courts when it enacted § 16(b). On the contrary, it made abundantly clear that any "purchase and sale" of any "equity security" by any statutorily-defined corporate insider must give rise to § 16(b) liability. *Kern County Land Corp. v. Occidental Corp.*, 411 U.S. at 605–06, 93 S.Ct. at 1750 (Douglass, J., dissenting).

To be sure, borderline cases will arise. But the "pragmatic approach" should remain the exception, to be used only when a transaction simply cannot be fit within the rubric of a "purchase and sale," yet involves the transfer of stock ownership rights and interests which raises the spectre of insider abuse. Where a set of transactions can be construed as a purchase and sale of an equity security, the words of the statute, as well as its legislative intent, mandate that the "objective approach" apply. *Portnoy v. Memorex Corp.*, 667 F.2d 1281, 1284 (9th Cir.1982).

The instant case provides a perfect illustration of the problems presented by an over-reliance on the pragmatic approach in § 16(b) analysis. HCA's acquisition and relinquishment of the lock-up option for American stock was precisely the sort of "purchase and sale of an equity security" to which the objective approach should apply. The lock-up option was an equity security;[6] it was acquired (purchased) for value; it was relinquished (sold) for value. Thus, the only question that remains is whether HCA was a beneficial owner at the time of acquisition. Since it was not—HCA became a beneficial owner when it acquired (purchased) the option and thus was not a beneficial owner "before the pur-

---

**6.** Although options are not defined as equity securities within the Security Exchange Act ("the Act"), *see* § 3(a)(11), 15 U.S.C. § 78c(a)(11), that section gives the SEC authority to include within the definition of equity security "any other security which the Commission shall deem to be of a similar nature" and considers appropriate to treat as an equity security. Since the Act does define options as securities, *see* § 3(a)(10), the SEC could, and did, extend the definition of equity security to include "any put, call, straddle or other option or privilege of buying a[n equity] security from or selling a[n equity] security to another without being bound to do so." Securities Exchange Act Rule 3a11–1, 17 C.F.R. § 240.3a11–1. *See* Beatty, "Exchange–Traded Options and Section 16(b): Panacea or Plague for Insider's Short-Swing Profits?" 33 *Bus.Lawyer* 515, 523 (1983).

chase"[7]—HCA is not liable for the profits it derived from the "purchase and sale" of the lock-up option.

Yet, relying on the general confusion in the case law created by the overuse of "pragmatic analysis," plaintiff seeks to recast HCA's transactions in a somewhat different mold. He argues that the sale of a call option is equivalent in fact, and should be treated in form, as the "simultaneous purchase and sale" of the underlying security. In other words, plaintiff claims, when HCA sold for $200 million its right to purchase 29 million American shares, the result of that transaction was identical to the result which would have obtained had HCA exercised the option—thereby acquiring 39 million American shares for 29.5 HCA shares—and simultaneously sold 39 million American shares for 29.5 million HCA plus a $200 million profit. Since the latter set of transactions would give rise to § 16(b) liability, plaintiff argues, the former single transaction should as well.

In four published opinions, courts have addressed the question whether the sale of a call option[8] or its equivalent,[9] standing alone, constitutes a "simultaneous purchase and sale" of the underlying security

---

7. This court need not resolve the interesting problem of whether the purchase of the option for § 16(b) timing purposes occurred on March 30, 1985, the date the Merger Agreement created the option, or on July 2, 1985, the date the option became "presently exercisable." As noted above, the applicable date for determining ten percent beneficial ownership was the later date. *See supra* p. 1061. However, for the purposes of determining when a purchase giving rise to short-swing profits occurred, the earlier date might well be the proper one to use, since it was on this date that HCA's control over the purchase decision came to an end. *See* Hardee, *Harv.L.R.* at 1001 and 1001 n. 21; *cf. Kern County Land Corp. v. Occidental Corp.*, 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1972) (sale of call option did not occur on date it became exercisable where event triggering exercisability was not within the control of the seller). Either way, since HCA did not become a beneficial owner of American until July 2, it was not a ten percent beneficial owner of American "before the purchase."

8. Courts frequently fail to distinguish between the purchase and sale of a call option, on the one hand, and the writing of a call option, on the other. *See, e.g., Portnoy v. Revlon,* 650 F.2d 895, 898–99 (7th Cir.1981). The *purchase and sale* of a call option involves the acquisition and relinquishment of the right to acquire the underlying security at a given price at a time in the future. The *writing* of a call option, on the other hand, involves the undertaking of an obligation to sell the underlying security to the option's purchaser at a given price upon the purchaser's demand. *See Silverman v. Landa,* 306 F.2d 422, 423–24 (2d Cir.1962).

The failure to distinguish these very different concepts aggravates the confusion in § 16(b) cases. The *writing* of a call option often requires "pragmatic analysis" to determine whether it has been done in a way that gives rise to the possibility for speculative abuse on the part of the writer—who decides neither the date of the option's exercise nor even if the option will be exercised at all. *Silverman v. Landa,* 306

F.2d at 424 ("By its nature, the [writing of a call] option is one sided; it fixes the obligations, but not the rights, of the issuer."); *see also Kern County Land Corp. v. Occidental Corp.,* 411 U.S. 582, 93 S.Ct. 1736, 36 L.Ed.2d 503 (1972). The *purchases and sales* of call options, on the other hand, can be addressed with simple "objective analysis," since they are nothing more than alternative methods for purchasing and selling rights to the underlying securities. Tomlinson, "Section 16(b): A Single Analysis of Purchases and Sales—Merging the Objective and Pragmatic Analyses," 1981 *Duke L.J.* 941, 959 (1981); Hardee, "Stock Options and the 'Insider Trading' Provisions of the Securities Exchange Act," 65 *Harv.L.R.* 997, 1001–04 (1952); *see also Yale L.J.* at 870 ("As a method of insider speculation, purchase and sale of unexercised puts and calls is no different from purchase and sale of the stock itself.").

9. The cases deal with options, warrants and stock appreciation rights. Options and warrants "involve[ ] the right to purchase a specified number of shares of the issuer's securities (generally common stock) during the term of the option at a specified option price." Bloomenthal, 3B *Securities and Federal Corporate Law* § 10.07[2] at 10–24.1 (1983). Stock appreciation rights involve "the right to receive the appreciation on a specified number of shares of the company's securities (generally common stock) which occurs within a specified time period." *Id.*

Thus, when one *exercises* an option or warrant, he exercises the right to purchase stock and winds up with stock, which he may then sell if he wishes to realize the appreciation in the value of the stock since the time he acquired the option. However, when one *exercises* an SAR, he exercises the right to receive directly the appreciation in the value of the stock, and winds up with cash.

For the purposes of clarity only, this discussion employs the term "sale" to refer to both the sale of stock options and the exercise of SARs for cash or its equivalents.

and thus may violate § 16(b). *See Portnoy v. Seligman,* 516 F.Supp. 1188 (S.D.N.Y. 1981) (sale of stock warrants); *Matas v. Seiss,* 467 F.Supp. 217 (S.D.N.Y.1979) (sale of stock appreciation rights); *Rosen v. Drisler,* 421 F.Supp. 1282 (S.D.N.Y.1976) (sale of call option); *Freedman v. Barrow,* 427 F.Supp. 1129, 1153 (S.D.N.Y.1976) (sale of stock appreciation rights). In all four cases, the courts employed "pragmatic analysis" to determine whether insiders had to disgorge the consideration they received from the sales on the grounds that they represented insider "profits."

The courts first reasoned that, because the sales of those instruments came within the Supreme Court's definition of "unorthodox transactions," and because the sales did appear equivalent in effect to the "simultaneous purchase and sale" of the underlying securities, "pragmatic analysis" was appropriate. *See, e.g., Rosen v. Drisler,* 421 F.Supp. at 1285 ("The commercial substance of the transaction rather than its form must be considered ..."), *quoting, Bershad v. McDonough,* 428 F.2d 693 (7th Cir.1970), *cert. denied,* 400 U.S. 992, 91 S.Ct. 458, 27 L.Ed.2d 440 (1981). They then proceeded to examine whether the sales presented the possibility for speculative abuse.

Although in three of the four cases the courts ultimately concluded that § 16(b) liability should not attach because there was no possibility for speculative abuse under the facts of the particular cases, *but see Matas v. Seiss, supra,* their willingness to engage in "pragmatic analysis" at all resulted not only in confusion within the case law, but also, in one case, to a wrong result.

In *Matas v. Seiss,* the court imposed liability on officers and directors who sold stock appreciation rights (SARs) they had acquired years earlier. 467 F.Supp. at 227. The court reasoned that, because the sales of the SARs were the equivalent of purchases of the underlying stock and simulta-

neous sales of the stock for cash, and because the defendants' insider status gave them access to inside information which they could use to time the sales, § 16(b) required them to disgorge the amounts they received. *Id.* at 223–25. *See also Freedman v. Barrow,* 427 F.Supp. at 1153 (finding no liability where insiders sold SARs for *stock* but suggesting that liability would attach were they sold for *cash* ).

This reasoning contains a flaw. Had the court, using "objective analysis," treated the sales of the SARs as the sales of equity securities,[10] the absence of § 16(b) would have been obvious: Because the SARs were acquired years before the sales, the sales did not give rise to *short-swing* profits under § 16(b). *See Portnoy v. Texas International Airlines, Inc.,* 678 F.2d 695 (7th Cir.1982) (no liability where warrant holders had acquired warrants six years before their sale). The court went astray, however, when it accepted plaintiff's argument that "pragmatic analysis" was appropriate. For the court then became vulnerable to an error in § 16(b) analysis set forth in a line of cases which has long been accepted but which must now be revisited.

Virtually all courts to consider the issue have held that "an exercise of a[ ] [call] option is a purchase of the underlying stock for purposes of § 16(b)." Beatty, "Exchange–Traded Options and Section 16(b): Panacea or Plague for Insider's Short–Swing Profits?" 33 Bus.Lawyer 515, 518 (1983). 2 Loss, Securities Regulation ch. 6C at 1079 (1961); Comment, "Put and Call Options Under Section 16 of the Securities Exchange Act, 69 *Yale L.J.* 8707 (1960); *see, e.g., Colan v. Monumental Corp.,* 713 F.2d 330, 334 (7th Cir.1983); *Keller Industries, Inc. v. Walden,* 462 F.2d 388 (5th Cir.1972); *Blau v. Ogsbury,* 210 F.2d 426 (2d Cir.1954). Thus, according to these cases, if a person exercises an option for stock and then, within six months, sells the stock, he is liable under § 16(b) regard-

---

**10.** Pursuant to its rule-making power under § 16(b), the SEC has exempted the issuance, purchase, exchange, sale and issuance of certain SARs and stock options, issued pursuant to employee stock option plans which meet the rule's requirements, from the scope of § 16(b). 17 C.F.R. § 16b–3. This rule does not, however, alter the analysis for such instruments where they do not fall within the rule's exemptions.

less of whether he was a statutory insider on the date he acquired the option and regardless of whether that date was more than six months prior to the sale of the stock.

This judicial rule cannot withstand careful analysis. A person who acquires a call option acquires the right to purchase the underlying stock at a given price. If the price of the stock subsequently rises and the person exercises the option and then sells the stock, the "profit" he earns represents the "swing" in the price, not between the date of *exercise* of the option and later sale of the stock, but rather between the time he *originally purchases the option* and the time he sells the stock. *See* Hardee, "Stock Options and the 'Insider Trading' Provisions of the Securities Exchange Act," 65 *Harv.L.R.* 997, 1001–04 (1952).

If this period is less than six months, and if the person is a statutory insider at the time he originally purchases the option, then § 16(b) liability should arise. On the other hand, if this period is greater than six months, then the profit earned when the underlying security is later sold is long-term, and § 16(b) should not apply. Like-

wise, if the person is not a statutory insider at the time he originally purchases the option, then the person cannot use inside information in establishing his position in the option—and thus fixing his position in the underlying security—so the profits earned from the later sale should not be recoverable under § 16(b).[11] *See Foremost–McKesson v. Provident Securities*, 423 U.S. 232, 96 S.Ct. 508, 46 L.Ed.2d 464 (1975); *Allis–Chalmers Mfg. Co. v. Gulf & Western Industries, Inc.*, 527 F.2d 335 (7th Cir.1975). *But see* Comment, 69 Yale L.J. at 876 (arguing that "when the option in question is a put, call or other option with a fixed termination date, its exercise may properly be viewed as the beginning of a new six-month period").

The courts have strayed because they have viewed the intervening event—the exercise of the option for stock—as an independent purchase. This is incorrect. Because the option holder already owns the right to purchase the stock at a fixed price, his decision to actually exercise the option does not provide him the ability to earn insider profits and thus does not constitute a § 16(b) "purchase."[12] Tomlinson, "Sec-

**11.** On the flip side, consider the case of a corporate insider who becomes privy to confidential information that will cause the price of his company's stock to skyrocket in the near future. If he purchases stock, and the stock's price then rises, the insider must wait at least six months before he can realize the gain from his insider trading—six months during which the price might well fall back to its original level, or further—to avoid § 16(b) liability.

However, under the current approach to options, he can avoid this risk, and assure himself of short-swing profits, by initially purchasing call options rather than the stock itself. When the stock's price rises, he locks in his profit on the short-term swing in the stock's price—a profit identical to that which would have resulted had he initially purchased the stock itself—by selling short the underlying security. Although he must still wait six months before he can realize his profit on the option-purchase stock-sale—i.e., by exercising the options and covering the short-sale—without incurring § 16(b) liability, he does so without any risk; for the option gives him the right to purchase the stock at the pre-appreciation price.

This anamolous result would not obtain were the *purchase* of the options treated as the purchase of the underlying security. Then, the insider's decision to sell short following the stock's appreciation would give rise to liability

if this sale occurred within six months of the initial purchase of the options, and the insider's ability to earn short-swing profits would be foreclosed.

**12.** The Securities and Exchange Commission recognized the problem with the judicial treatment of call options when it promulgated SEC Rule 240.16b–6, 17 C.F.R. § 240.16b–6. This rule provides that, where an individual exercises a call option which he has owned for more than six months, the amount he must disgorge upon the later sale of the underlying stock shall not exceed the difference between the amount he receives for the sale and the lowest price for which the stock trades in the six months before and after the sale.

In other words, where an option holder holds the option for a long period of time during which the price of the stock rises, he will not be liable for the full amount of "profit" he obtains through an exercise and sale, because this "profit" does not reflect short-swing profiteering, but rather the long-term appreciation in the value of the stock. *Rosen v. Drisler*, 421 F.Supp. at 1287.

Yet, the rule does not go far enough; it continues to allow the imposition of liability on the long-term option holder who exercises and then sells, despite the fact that none of the profit he earns arises from the sort of short-swing trading

tion 16(b): A Single Analysis of Purchases and Sales—Merging the Objective and Pragmatic Analyses," 1981 *Duke L.J.* 941, 959 (1981) (one of the few commentators who have argued that the exercise of an option is not the purchase of the underlying stock for the purposes of § 16(b)); *see also Pay Less Drug Stores v. Jewel Companies,* 579 F.Supp. 1396 (N.D.Cal.1984); *cf. Pettey's v. Butler,* 367 F.2d 528 (8th Cir.1966) (conversions of equity securities from one class to another do not constitute purchases or sales under § 16(b) where the values of the two are interdependent); *Blau v. Max Factor,* 342 F.2d 304 (9th Cir.) (same), *cert. denied,* 382 U.S. 892, 86 S.Ct. 180, 15 L.Ed.2d 150 (1965); Note, "Mismatching Convertible Debentures and Common Stock Under Section 16(b)," 1985 *Duke L.J.* 1057 (1985).

In *Matas v. Seiss,* the court logically reasoned that if the exercise of an option is a purchase of the underlying stock, and if this purchase and the subsequent sale of the stock give rise to § 16(b) liability, then an effectively identical transaction—the sale of a call option or SAR—should produce liability as well. 467 F.Supp. at 224.

Once it is recognized, however, that it is the acquisition of the option itself which is properly viewed as the § 16(b) purchase, the possibility for error disappears. "Objective" analysis then requires that the court simply match the *purchase* of the option with the later sale, either of the option itself *or* of the underlying stock; liability will attach only if the initial purchase of the option and the later sale occur within a period of six months, and if the defendant is an insider prior to the purchase. In *Matas v. Seiss,* the option holders had acquired their options (SARs) years earlier, so imposing liability on them was a mistake.

The courts in the three other "simultaneous purchase and sale cases" also employed "pragmatic analysis" in addressing plaintiffs' arguments that the mere sale of an option could give rise to § 16(b) liability.

These courts arrived at the correct result—no § 16(b) violation—only because, unlike the *Matas v. Seiss* court, they were willing to treat the exercise of an option and *simultaneous* sale of the underlying security completely differently than they would have treated the exercise of an option and the *subsequent* sale of the underlying stock. They justified this difference in treatment on the grounds that only in the latter case is there "a 'span of time ... in which the market could fluctuate and which could be exploited ... by the insiders in the form of short-swing profits.' " *Portnoy v. Seligman,* 516 F.Supp. at 1197, *quoting, Rosen v. Drisler,* 421 F.Supp. at 1287.

Yet, that effort to distinguish the two situations but lacks merit; for it is not the span of time between the *exercise* of an option and the *sale* of the stock that gives rise to the possibility for speculative abuse, but rather the span of time between the *purchase* of the option and the *sale* of stock. This span of time exists whether the *exercise* of the option and the sale of the stock are simultaneous, separated by ten minutes, or separated by ten weeks.

Ironically, then, it was only *Matas v. Seiss* which "correctly" applied the principles developed in generic "exercise-sale" cases to "simultaneous exercise-sale" cases; yet that case alone among the four came out wrong because the underlying premise with which all four cases started—that the exercise of an option is the purchase of the underlying stock—was flawed. More importantly, it was the reliance on the "pragmatic approach" where the "objective approach" properly applied which led these courts into unnecessarily complicated and ultimately defective analyses.

*Pay Less Drug Stores v. Jewel Companies,* 579 F.Supp. 1396 (N.D.Cal.1984), a case that has received considerable attention from courts and commentators, *see, e.g.,* Note, "Mismatching Convertible Debentures and Common Stock Under Section 16(b)," 1985 *Duke L.J.* 1057 (1985), and one

---

proscribed by § 16(b) law. *See* 2 Loss at 1081 (supporting the SEC rule on policy grounds but also noting the logical problems with using "the

exercise [of call options] to determine whether the stock has been bought and sold within six months").

similar in many ways to the instant case, demonstrates again the willingness of courts to undertake "pragmatic analysis" where objective analysis should apply. In that case, Jewel acquired 13.2% of Pay Less stock at the same time that it acquired an option to purchase another 19.2% if an intended merger between the two companies did not go through. Within a few months, the merger plans came to an end because Northwest made an offer for Pay Less which Jewel refused to match. Jewel then exercised its option and sold the stock for a substantial profit.

The court held that Jewel did not have to disgorge the profit it made on the series of transactions. It began with the "objective approach": Jewel could not be held liable on the basis of its original acquisitions of stock and options and its subsequent sale of Pay Less stock because Jewel was not a statutory insider of Pay Less *prior* to the "purchases."

The court, unfortunately, did not stop there. It went on to analyze the transactions under the "pragmatic approach." It then found that the *exercise* of the options *was* a potential § 16(b) "purchase," and that Jewel was not liable only because the transactions did not create the "danger of speculative abuse of inside information." The court explained:

> The facts of this case present no possibility for the speculative abuse "based upon access to inside information" that § 16(b) was intended to guard against. *Kern,* 411 U.S. at 594. Although Jewel's decision to exercise its option was a voluntary one, it was not a decision "based upon" inside information about Pay Less which Jewel could utilize to gain unfair advantage over other shareholders. The decision was based upon the difference in price between Northwest's *public* tender offer (which Jewel had no prior knowledge of) and the value of Jewel stock that would have to be paid to [the writer of the option] upon exercise of the option. The rate of exchange of Pay Less for Jewel's shares was fixed by the option before Jewel became a statutory insider by virtue of its purchase of the 13.2% block.... These facts permitted

Jewel to engage in what can best be described as an arbitrage transaction, not one in which it was able to take advantage of inside information about Pay Less at the public's expense. (Emphasis in original).

*Id.* at 1401.

Thus, the *Pay Less* court saw the problem with treating the exercise of an option as the purchase of the underlying stock, but remained unwilling to extend its analysis beyond the "facts of this case." This is regrettable, for that court's analysis of why the exercise of those options and sale of the underlying stock fell outside the proscriptions of § 16(b) applies to exercise-sale sequences generally: They do not, on their own, fall within the proscriptions of § 16(b) because the first transaction, the "exercise," is not a "purchase" for the purposes of this statute.

What is more regrettable, however, is that the *Pay Less* court engaged in "pragmatic analysis" at all. The purchases of the stock and options and the subsequent sale of the stock were ordinary, voluntary "cash-for-security" transactions which, under "objective analysis" simply did not give rise to § 16(b) liability. There was no need to complicate matters by reconstructing the transactions in a way which required the court to delve into the particular facts of the case. Although the result there did not change, the complexity of the decision, and the possibility for error in future cases, increased substantially.

In the instant case, two things are clear. First, even were this court to accept plaintiff's invitation to undertake "pragmatic analysis" and view the sale of the lock-up option as the simultaneous exercise of the option and sale of the underlying stock, no liability could be imposed on HCA. Because HCA was not an insider when it acquired (purchased) the lock-up option, and because its exercise of the option would not have amounted to a § 16(b) "purchase" of the underlying American stock, plaintiff can prove no set of facts which would establish a "purchase and sale ...

within six months" which could have been based on inside information.

Second, and more importantly, pragmatic analysis is simply not appropriate in this case. There was a purchase of an equity security—the lock-up option—and there was a sale. The only remaining question, therefore, is whether HCA was a beneficial owner of more than ten percent of HCA stock at the time of the purchase; it was not. Any further inquiry into HCA's ability to employ inside information in engaging in these transactions involves an unnecessary contravention of the purposes and principles of § 16(b).

## CONCLUSION

Accordingly, American's motion to dismiss for lack of standing is denied; HCA's and American's motions to dismiss the case for failure to state a claim are granted.